UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STAT EMERGENCY MEDICAL
SERVICE, INC.,

                Plaintiff,

    vs.

                            Case No. 13-CV-14960

                            HON. GEORGE CARAM STEEH

SAGINAW VALLEY MEDICAL
CONTROL AUTHORITY, et al.,

                Defendants.

_____/

OPINION AND ORDER GRANTING IN PART
PLAINTIFF'S MOTION FOR INJUNCTIVE RELIEF [DOC. 46] AND
DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DOC. 52]

      This case arises out of plaintiff ambulance company STAT's application to

provide limited emergency medical services in Saginaw County.  Presently, Mobile

Medical Response, "MMR", a non-profit corporation formed by area hospitals, handles

dispatching for all emergency medical 911 calls originating within Saginaw County.

Defendants contend that they denied approval of STAT's application to operate in

Saginaw County because they believe STAT's entrance into even limited areas of

Saginaw County would disrupt the carefully constructed EMS system created by the

Saginaw County Board of Commissioners.  For this reason defendants found that STAT

did not show a clinical need, and therefore declined to provide medical control oversight

under the state statutory scheme.

      STAT needed defendants' approval of its Life Support Agency License

Application ("Part I application") so it could provide emergency medical response for

communities within the Saginaw Valley Medical Control Authority's ("SVMCA") geographic area.  STAT's federal lawsuit requests injunctive relief due to *Ultra Vires* acts (Count I), and asserts violation of the Fourteenth Amendment Due Process Clause (Count II), violation of the Fourteenth Amendment Equal Protection Clause (Count III), a taking under the Fifth Amendment (Count IV), damages pursuant to 42 U.S.C. § 1983 (Count V), violation of the Sherman Antitrust Act (Count VI), and tortious interference with contractual and business relationship (Count VII).

BACKGROUND

I. Statutory Scheme

The Emergency Medical Services Act ("EMSA") exclusively governs all aspects of emergency medical services in Michigan, including the licensing of an ambulance operation.  The EMSA provides four levels of licensure of an ambulance operation, including medical first response life support, basic life support, limited advanced life support and advanced life support, "ALS".  M.C.L. 333.20904(4).  STAT has been licensed at the highest level of licensure, ALS, since becoming a licensed ambulance operation in Michigan.

The EMSA gives the Michigan Department of Community Health ("Department") the exclusive authority to grant ambulance licenses.  The licensing statute mandates that if an applicant meets the statutory requirements set forth in part 209 of the Michigan Public Health Code, complies with all of the rules promulgated pursuant to the Code, and submits a proper application and fee, the Department shall issue a license.  M.C.L. 333.20920(2).

-2-

The Department also has the power and duty to designate a medical control authority for local regulation of health services, including ambulance providers.  M.C.L. 333.20918(1).  Medical control means supervising and coordinating emergency medical services through a medical control authority within an emergency medical services system.  M.C.L. 333.20906(4).  A medical control authority is administered by hospitals located within its geographical territory.  M.C.L. 333.20918(2).  The hospitals select an advisory board, which appoints a medical director.  The medical director is responsible for medical control for the emergency medical system. Rule 325.22205(1).  An ambulance provider is accountable to the medical control authority where the agency is licensed to operate for responding to an emergency in its "service area".  M.C.L. 333.20918(6); 333.20921(1)(c).

II. <u>STAT Seeks Medical Control Oversight from SVMCA</u>

In September of 2011, STAT entered into a contract with Michigan based health insurer, Health Plus of Michigan, Inc. ("Health Plus"), to provide patient transport services in six Michigan counties, including Saginaw County.  After signing the contract, STAT was approached by several townships and fire departments in Saginaw County requesting STAT provide response to emergency calls in their communities.  Unlike patient transport, emergency response calls require medical oversight.

STAT applied to the SVMCA seeking medical control to provide emergency response in a geographic service area designated as part of the SVMCA's medical control authority.  STAT anticipated the SVMCA Medical Director, defendant Dr. Noel Wagner, would sign STAT's Part I application certifying that he would provide medical control oversight.  After obtaining the medical director's signature, STAT's application

-3-

would be forwarded to the State for licensing. However, Dr. Wagner refused to sign the application after the SVMCA Board of Directors voted to reject STAT's application for medical control in the SVMCA's service area. Plaintiff believes the reason its application was rejected was to enhance the monopoly status of the sole private transporting advance life support ambulance company in Saginaw County, MMR.

MMR is not a party to this case, though they were given permission to file an Amicus Curiae brief. MMR is owned by two Saginaw area hospitals which provide 95% of the funding for the SVMCA and which control the SVMCA Board, by appointing hospital representatives to the SVMCA Board. For example, Ed Bruff sits on the MMR Board and is also the Chairman of the SVMCA Board of Directors. Defendants acknowledge it is their desire to maintain a single advanced Life Support Agency provider in order to ensure a quality EMS system in the SVCMA.

Plaintiff alleges that Dr. Wagner and the SVMCA Board illegally, through an *ultra vires* exercise of authority, denied STAT the right to operate in the SVMCA, claiming that STAT failed to meet the requirements of a "clinical needs" protocol enacted by the SVMCA for the sole purpose of protecting MMR. The SVMCA required STAT to prove: (a) that its services were needed in the SVMCA and (b) whether allowing STAT to operate in the SVMCA would result in economic harm to MMR.

Plaintiff claims this protocol is illegal because there is no authority in the EMSA or the administrative rules for such protocol. In the event the protocol is found to be authorized, plaintiff contends that defendants violated its due process rights because the protocol is vague, ambiguous and enforced in an arbitrary and capricious manner. Finally, if the protocol is found to be facially valid, STAT contends it has met all the

-4-

requirements of the protocol, as determined by the Department.  According to plaintiff, defendants' actions have negatively impacted STAT's relationship with medical providers, have impacted the choices of patients and medical providers, and have potentially endangered patients by forcing them to use ambulance services with slower response times.  Plaintiff seeks an order compelling SVMCA to sign the Part 1 application stating it will provide medical control to STAT.

    A.  <u>STAT'S Accreditation</u>

STAT has been nationally accredited through the Commission on Accreditation of Ambulance Service ("CAAS") since 2009.  Accreditation signifies that STAT meets the gold standard in the industry for delivery of ambulance services.  In order to maintain accredited status with CAAS, ambulance agencies must pass accreditation reviews every three years.  On May 5, 2015, STAT was granted a three-year re-accreditation by CAAS.

Pursuant to administrative rules governing EMS in Michigan, STAT's designated primary dispatch "service area" for responding to medical emergency calls is in Genesee County.  As a licensed LSA, STAT currently functions under the supervision of the Genesee County Medical Control Authority ("GCMCA") when responding to an emergency in its primary dispatch service area.  In addition, as a licensed ambulance operation, STAT provides patient transport services, for a profit or otherwise, as authorized by statute.  There are no geographical limits on an ambulance operation performing patient transport services.

B.  STAT'S Contracts

In the fall of 2011, STAT entered into a contract with Health Plus, a Michigan-based insurance company, to manage Health Plus's ambulance transports in six counties in Michigan, including Saginaw.  STAT's contact with Health Plus was Cheryl Gallon, a vice-president and Director of Medicaid Services, who was responsible for the transportation contract with STAT.

Shortly after contracting to provide patient transport services for Health Plus, Birch Run Township Supervisor, Dr. Kurt W. Kiessling D.V.M., selected STAT to provide emergency response to the residents of the Township and Village of Birch Run.  Dr. Kiessling made his choice known to the SVMCA and offered a letter of support on STAT's behalf.  In 2011, the SVMCA required all ambulance companies which desired to operate in the SVMCA to request an application in writing and pay a $2,500.00 application fee.  STAT requested an application in the fall of 2011.  At that time, the EMS Manager for the SVMCA, Eric Snidersich, and STAT's Chief Operating Officer, Joe Karlichek, had a conversation during which Karlichek told Snidersich that STAT had a contract with Health Plus to provide transports in several counties, including Saginaw, and would be applying for medical control oversight to provide emergency response in the SVMCA pursuant to other pending contracts.

C.  Background of Clinical Needs Protocol

On November 10, 2011, Snidersich contacted Gallon of Health Plus and advised her (incorrectly) that STAT was not authorized to conduct non-emergency ambulance transports that began and ended in Saginaw County.  Snidersich confirmed this

-6-

conversation in a November 10, 2011 email to Dr. Noel Wagner, the SVMCA's Medical

Director:

> I just spoke with Cheryl Gallon at Health Plus.  She understands how the
> MCA system works now.  She says that STAT EMS will have to contact an
> approved service to provide transports that occur in our MCA.  Payment
> for those services will be the responsibility of STAT though.
>
> Health Plus asked if the STAT Ambucab (caravan) could transport
> patients since they are not EMS licensed personnel.  I said yes as long as
> it was not an ambulance.

(Pl. Ex. 6)

On November 28, 2011, one day before the SVMCA received STAT's

application, MMR CEO, Mark Thompson, emailed Dr. Wagner about a meeting to

discuss Bridgeport Township's plan to replace MMR with STAT as the primary EMS

provider in that community.  In the email Thompson tells Wagner that either he "and or

Eric [should] attend that meeting [T]hursday and weigh in on the medical necessity

issue.  We have been consistently told by the Bridgeport [T]ownship leadership that

there are no service issues and they are very satisfied with our services; it [is] just a

financial issue.  Obviously we can not leave Bridgeport and this can fragment the

service to that community."  Thompson also asked for SVMCA's support in preventing

STAT from performing patient transports in Saginaw for Health Plus.  (Doc. 46, Ex. 7).

Snidersich responded to Thompson's email, acknowledging that he, Dr. Wagner and

another SVMCA physician Dr. Charlton, would be attending the meeting at Bridgeport

Township.  On the issue of patient transport, Snidersich responded that the "SVMCA

does not currently have or intend on entering any cooperative agreement with GCMCA

[Genesee County] that would allow such transports from outside agencies." (Doc. 46, Ex. 8).

MMR's Thompson was the individual who started the process for SVMCA to adopt the clinical needs protocol by providing Dr. Wagner with examples of language. He explained this was "to protect the Saginaw market" and to prevent "any ambulance companies from entering the market." (Doc. 59, Ex. 1, Thompson dep p. 78). The SVMCA explains that it developed the clinical needs and impact protocol based on its experience with LSAs and how they can affect the stability of the EMS system in Saginaw and Tuscola Counties. This area, which is largely rural, has a small number of emergency calls, and in the past many LSAs failed, making it impossible for the SVMCA to ensure quality and reliable EMS service to the community. On March 30, 2011, the SVMCA Board approved the new provider protocol with Thompson's recommended "clinical need" language.

The Chairman of the MMR Board of Directors, James Van Tiflin, testified that the SVMCA's clinical need protocol was designed to ensure that the SVMCA is serviced by one provider, MMR, and that the clinical need protocol protects MMR. (Doc. 59, Ex. 7, Van Tiflin dep. p. 152).

D. STAT's Application for Medical Control Authority

STAT was the first LSA to apply for medical control oversight with SVMCA using the newly adopted protocols. On November 28, 2011, Karlichek sent an email to Snidersich advising him that STAT was preparing to file its application to operate in the SVMCA and wanted assurances that the proprietary financial information contained in the application would be kept confidential and not shared with any party for competitive

purposes.  Snidersich responded that only SVMCA's office personnel and the Board of Directors would review the application, and that the Medical Control Board would not have access to the application.  (Doc. 46, Ex. 9).

On November 29, 2011, Karlichek hand-delivered STAT's application directly to Snidersich.  The application had a number of attachments, ranging from vehicle and staffing information, to financial and clinical performance information, to the confidential Health Plus contract.

On December 8, 2011, Snidersich sent a letter to STAT, pointing out deficiencies in its application and requesting additional information, including the "geographic response area" to be covered by STAT, mutual aid agreements with adjoining SVMCA agencies, and clinical needs and survey information.  (Doc. 46, Ex. 12).

On January 6, 2012, STAT submitted its supplemental response packet.  With regard to the geographic service area that STAT proposed to service, STAT identified Birch Run, Michigan, and committed to a significantly faster response time standard than was then being provided to the community by MMR.  Specifically, STAT proposed an 8 minute 59 second response with 90% compliance compared to the 12 minute 59 seconds with an 80% compliance required by the SVMCA Response Time Protocol.  In support, STAT submitted a letter from Dr. Kiessling, the Birch Run Township Supervisor, expressing dissatisfaction with the ambulance service provided by MMR, highlighting poor response times.  (Doc. 46, Ex. 13).  STAT offered to staff the calls for EMS services out of Birch Run with a single ALS ambulance 24-7.  Birch Run averages less than one emergency call per day.

In its supplemental response, STAT did not provide a signed mutual aid agreement.  Rather, STAT indicated that Twin Township Ambulance Service and its Board agreed to provide a mutual aid agreement upon STAT being licensed by the State.

Regarding the request for clinical need and survey information, STAT responded that SVMCA has "no identified process to determine what specific expectations there are" such as a "checklist or benchmark".  STAT referred to market research surveys and its contract with Health Plus to establish clinical need, and stated its projected improved response times will benefit the market without causing undue hardship to MMR.  STAT included a request for SVMCA's clinical needs protocol:

> In order to more fully meet the Needs requirement, STAT requests the SVMCA provide the protocol or other criteria necessary to meet a Needs Assessment.

The SVMCA never responded to STAT's request.[1]

On February 27, 2012, Snidersich advised STAT that the SVMCA Board had authorized Snidersich and Wagner to move forward with the agency inspection.  The SVMCA conducted an onsite agency visit to STAT's facility on March 20, 2012.  On March 30, Snidersich advised STAT that "no deficiencies were noted and that the

---

[1]STAT contends that it was never provided with a copy of the protocols.  STAT CEO Karlichek was questioned about this at his deposition where he was shown an email trail between himself and Snidersich.  In the first email Snidersich attaches the application, noting that "it is closely associated with our agency protocol."  (Doc. 46, Ex. 1, Karlichek dep. p. 62).  In a subsequent email there are attachments indicating "Application to Operate and Medical Control Privileges and Life Support Agency Standards".  (Doc. 46, Ex. 1, Karlichek dep. p. 62-63; Ex. 8 email chain).  Life Support Agency Standards are the SVMCA's protocols.

SVMCA offices of the medical director will report a 'satisfactory' score to our Board of Directors."  (Doc. 46, Ex. 14).

On May 1, 2012, five weeks before the SVMCA Board actually voted on STAT's application, Snidersich drafted a letter for Board Chair Ed Bruff's signature denying STAT's application.  (Doc. 46, Ex. 17).  The SVMCA Board met on June 6, 2012 and considered STAT's application.  At the meeting, Snidersich presented a PowerPoint presentation to the Board focusing on the SVMCA's desire to deny new applicants the right to operate in the SVMCA in order to protect the current provider, MMR.  (Doc. 46, Ex. 19).  One of the slides showed that MMR was not meeting the response time protocol standard of 12:59 for 80% of the emergency calls as mandated by SVMCA's Response Time protocol.  (Doc. 46, Ex. 19).

Ed Bruff, who was a Board Member of MMR in addition to being Chairman of the SVMCA Board, recognized a conflict of interest and recused himself from voting on STAT's application.  However, Bruff still advocated against STAT's application before the vote was taken.  The remaining Board members voted 3 to 0 denying STAT's application.[2]

Dr. Wagner stated the reasons for the Board's denial of STAT's application in a letter to STAT CEO Marc Lund dated June 8, 2012.

_____

[2] Rick Ohle was one of the three SVMCA Board members who voted against STAT's application.  He was employed by one of the two hospitals which owned MMR, St. Mary's Hospital.  Ohle knew that St. Mary's Hospital CEO John Graham and Chairman of the Hospital Board James Van Tiflin both sat on the MMR Board.  Ohle even acknowledged that St. Mary's Hospital had a financial interest in MMR at the time of the vote.  Ohle did not believe he had a conflict of interest and did not recuse himself from the vote.

-11-

1. Emergency service requirements are currently being met in the proposed area. Response time analysis, clinical indicators, and lack of negative pre-hospital incident reports were all considered.
2. The application did not establish a need through an acceptable survey/assessment or empirical evidence.
3. The potential for growth in the area is not substantial enough to support the level of service being proposed.
4. Rural community EMS response relies on an economy of scale from higher volume areas and thus transferring a fixed volume and reimbursement to another provider will negatively impact all communities by increasing cost per call to each agency.
5. A mutual aid agreement with a similarly capable, contiguous, and approved SVMCA agency was not presented.
6. The service area was not properly defined. The application addresses the Birch Run Community but does not delineate between the Township and Village.

(Doc. 46, Ex. 25).

The Department's regulations require that if a medical director refuses to provide medical control oversight, immediate notice must be given to the Department. Rule 325.22205(2). On June 11, 2012, Wagner sent a letter to Robin Shivley, then the Department's Director of the EMS Division. The letter provided similar bases to those offered in Wagner's earlier letter to STAT. (Doc. 46, Ex. 26).

On June 28, 2012, STAT filed an Allegation/Complaint Form with the EMS Section, disputing as non-meritorious each of the six bases for denial of STAT's application and requesting a review because the SVMCA lacked an appeal process. In addition, STAT's complaint charged that the SVMCA's decision was in conflict with its own By-Laws and the SVMCA Protocols. The parties were permitted to submit supplemental information.

Shivley conducted a denial justification review ("DJR") of the SVMCA's denial of STAT's application and concluded that the SVMCA had improperly denied STAT the

right to operate in the SVMCA's geographic service area and also concluded that the SVMCA's denial was fraught with conflict of interest. Shivley's April 9, 2013 letter stated, "it is the Department's position that the Saginaw Valley Medical Control Authority should allow STAT EMS to provide service to the Birch Run area and should reconsider their denial of STAT's application." (Doc. 46, Ex. 31).

On April 18, 2013, counsel for STAT requested that SVMCA act on Shivley's findings and allow STAT to operate in the SVMCA. The SVMCA stated that only the Board could consider the matter and would do so at its June 20, 2013 meeting. At that meeting, the Board refused to consider STAT's application. Snidersich acknowledged his receipt of the Departments' letter and stated that there was no basis for the Department's findings. This information was related to the Department by letter dated June 21, 2013. (Doc. 46, Ex. 33).

On July 11, 2013, Kurt Krause, then Director of the Bureau of Legal Affairs for the MDCH, sent a letter to SVMCA advising them they had failed to act in accordance with the Department's directive of April 9, 2013, and directed the SVMCA to immediately sign the Part I authorizing STAT to operate within the SVMCA.

> It has come to my attention that the [SVMCA] has ignored and/or failed altogether to act on the department's finding and conclusions concerning STAT EMS, and has further failed to address the intrinsic conflicts of interest Ms. Shivley has identified.

> Implicit in Rule 205 is the notion that once the department has conducted a denial justification review that was required as a result of a medical director's refusal to sign a life support agency's application, the medical director shall then follow the results of the department's review. By failing to perform in accordance with its department-approved protocols, Dr. Wagner and the SVMCA have failed to follow this Rule, and have thus been acting in ultra vires manner.

(Doc. 46, Ex. 34).  Dr. Wagner and the SVMCA did not sign the Part I.

On July 25, 2013, Mr. Krause convened a meeting with Dr. Wagner, Mr.

Snidersich, representatives from STAT, and counsel for each party.  As a result of the

meeting, the Department issued a letter on July 30, 2013 in which Kurt Krause

committed to:

1.    Providing a deadline by which the SVMCA's counsel would provide
      any additional information that the SVMCA might want to provide in
      support of its decision to deny STAT's application and/or a revised
      decision; and
2.    Responding to STAT's counsel's request that MDCH approve STAT's
      application on an interim basis until such time that the SVMCA provides its
      additional information or revised decision.

Mr. Krause set a deadline for the SVMCA to provide the additional information or a

revised decision of August 9, 2013.  Mr. Krause declined STAT's request for interim

approval on the basis that he found no support in the Public Health Code for such

action. (Doc. 46, Ex. 35).

The SVMCA responded by asking the Department to "withdraw, modify or

replace" the DJR findings because they were a preliminary review, and not a final

determination of an appeal.  (Doc. 46, Ex. 36).  On September 16, 2013, Mr. Krause

issued a letter rejecting SVMCA's position, stating: "After careful consideration of all the

information provided, as well as pertinent provisions of the Public Health Code and

attendant Administrative Rules, the Department stands by its conclusion that the

[SVMCA] should allow STAT EMS to provide emergency medical response to the Birch

Run area."  (Doc. 46, Ex. 38).

The SVMCA still refused to sign the Part I application to ensure medical control

to STAT.  While the Department determined that it could revoke or suspend the

SVMCA's designation, it concluded that it would not be in the best interest of the citizens served in that region to do so.

This matter is presently before the court on STAT's motion for injunctive relief. STAT seeks an injunction compelling defendants to sign the Part 1 application, thereby granting STAT the right to operate in the SVMCA.

Defendants oppose STAT's motion for injunctive relief and move for summary judgment in their favor.

## PLAINTIFF'S MOTION FOR INJUNCTIVE RELIEF

I.  <u>Standard of Review</u>

The decision of whether or not to issue a preliminary injunction lies within the discretion of the district court.  <u>CSX Transp., Inc. v. Tennessee State Bd. of Equalization</u>, 964 F.2d 548, 552 (6th Cir. 1992).  In determining whether to grant or deny an injunction, the district court is required to consider four factors:

1.  whether the movant is likely to prevail on the merits;

2.  whether the movant would suffer an irreparable injury if the court does not grant a preliminary injunction;

3.  whether a preliminary injunction would cause substantial harm to others; and

4.  whether a preliminary injunction would be in the public interest.

<u>G & V Lounge v. Michigan Liquor Control Comm'n</u>, 23 F.3d 1071, 1076 (6th Cir. 1994) (citing <u>International Longshoreman's Ass'n v. Norfolk S. Corp.</u>, 927 F.2d 900, 903 (6th Cir. 1991), <u>cert.</u> <u>denied</u>, 502 U.S. 813 (1991).

II. <u>Likelihood of Success on the Merits</u>

    A. <u>Statutory Authority Exceeded</u>

The medical control authority is a creature of statute and can only do what it is authorized to do by statute. The EMS Act designates the medical control authority to provide medical control, defined as "supervising and coordinating emergency medical services . . . as prescribed, adopted, and enforced through department-approved protocols". MCL 333.20906(4). The Act provides the requirement that the medical control authority establish categories of protocols. MCL 333.20919(1)(a) - (k). The nature of those protocols is to ensure the quality of pre-hospital care delivery within the geographic area covered by the medical control authority. "A medical control authority shall establish written protocols for the *practice* of life support agencies and licensed emergency medical services personnel within its region. The medical control authority shall develop and adopt the protocols required under this section in accordance with procedures established by the department and shall include all of the following: [(a) through (k)]." (Emphasis added)

The SVMCA argues that the clinical need/impact on the system protocol falls within the following two categories required by statute:

        (a)    the acts, tasks, or functions that may be performed by each type of emergency medical services personnel licensed under this part.

        (b)    medical protocols that ensure the appropriate dispatching of a life support agency based upon medical need and the capability of the emergency medical services system.

MCL 333.20919(1)(a) and (b).

The first category requires a medical control authority to establish protocols to delineate what "acts, tasks, or functions" may be performed by each type of EMS personnel.  There is no support in this section of the statute for SVMCA's requirement that applicants must establish a clinical need for the services they wish to perform in the geographical area covered by the medical control authority to which they are applying for oversight.  In fact, this category applies to personnel already licensed under the statute, and a precursor to being licensed requires the medical control authority's signature on the Part I Application.

The second category requires protocols to ensure that dispatching of EMS services is based on medical need and capability.  In the context of dispatching, which only applies to an EMS provider once they are licensed to operate in a geographic area, the needs of the particular emergency situation must be matched with the life support agency which has the appropriate skills to respond to the situation.  The protocols anticipated by subsection (b) require the dispatcher to take a look at the situation on a micro-level.  For example, what skills are needed to respond to an automobile accident where the victims suspect they have broken bones.  That is the medical need and capability the protocols required by this category are anticipated to address.

The SVMCA did something very different when they developed medical protocols to look at the emergency medical services system on a macro-level to determine if another life support agency should be permitted to operate within its geographic area. The clinical need protocol adopted by SVMCA states that an applicant "shall describe and establish the clinical need for the new or upgraded service and its impact on the

existing EMS care delivery system."  The SVMCA Board claims it developed and

adopted the protocols, specifically the clinical need/impact to the system provisions,

because it is critical to ensuring a quality EMS system.  (Snidersich Aff. ¶ 23).  The

SVMCA further justifies its protocols by pointing out that they were approved by the

Department before they were implemented.  (Doc. 52, Ex. 29, August 5, 2011 Letter).

The court's reading of the Act's authorization of protocols, however, simply does not

support the clinical needs protocol as developed and applied by the SVMCA.

        The requirement that the applicant submit a signed mutual aid agreement is

intended to cover situations when the emergency services provider experiences

equipment or staffing issues and requires assistance from another agency to provide

services.  The mutual aid protocol requires that "[a]ll LSAs shall maintain mutual aid

agreements with adjoining SVMCA approved agencies to provide for additional or

replacement resources during times of saturation, mechanical failure, or mass

disaster/casualty incidents. . . .  Signed mutual aid agreements shall be provided to the

SVMCA upon application or at any time requested.  Protocols, §3(a), (c).  This language

appears in Section 3 of the SVMCA's Systems Protocol for Life Support Agencies,

which is a general section that applies to agencies for which SVMCA is already

providing oversight.  (Doc. 52, Ex. 2).  Section 13, which addresses new and upgraded

services, does not contain a requirement that a new applicant provide proof of a mutual

aid agreement.  Regardless, STAT provided in its application that it had agreements

from other agencies that they would sign a mutual aid agreement with STAT once STAT

became licensed to operate in the SVMCA.  Both Krause and Shivley, from the

Department, testified at their depositions that they believed STAT satisfied the mutual

-18-

aid protocol.  (Doc. 46, Ex. 39, Krause dep. 105-06; Doc. 46, Ex. 40, Shivley dep. 191-92).

The Administrative Rules promulgated by the Department include Rule 325.22207 which states that "[e]ach medical control authority shall establish written protocols as defined in section 20919 of the code, which shall include, but not be limited to all of the following . . . ." (emphasis added).  Rule 325.22207 lists protocols and categories of protocols that parallel MCL 333.20919.  Defendants contend that they were not limited to the specific protocols and categories of protocols listed in the statute or the administrative rules, as long as the protocols implemented were approved by the Department.

As a matter of statutory construction, a court must read the words of a statute in their context within the overall statutory scheme.  *National Ass'n Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 666 (2007) (citations omitted).  Where the department rule uses the phrase "shall include, but not be limited to all of the following", as applied to protocols, the court interprets the rule to require that any protocols not specifically described shall be of the same type as those listed.  It is easy to imagine new technology or training, or even a new statutory requirement for medical providers, that is not directly covered by the categories of protocols listed in the statute or rules, but which is of the same nature or type, and which serves the same purpose, as those actually listed.

The Administrative Rules further provide that the Medical Director "shall ensure the provision of medical control."  Rule 325.22205(2).  If the medical director refuses to sign the LSA's application for licensure or relicensure, they must notify the department

in writing providing justification for the denial.  Such refusal of a medical director to sign a LSA's application results in denial justification review by the department.  Rule 325.22205(2).

SVMCA's stated reasons for declining to grant medical control oversight and sign the Part 1 Application were failure to demonstrate clinical need and failure to obtain a signed mutual aid agreement.  The fact that the department conducted a denial justification review and found that STAT satisfied the requirements of operating in the SVMCA shows the protocols, even as adopted and applied by the SVMCA, did not motivate the SVMCA's rejection of STAT's application.  The evidence tends to show that the real reason SVMCA refused to grant oversight to STAT was to protect MMR.

B.  Due Process Violation

STAT does not take issue with the Emergency Medical Services Act itself, but rather with the way it was applied by SVMCA, particularly regarding its adoption of the clinical needs protocol.  This is STAT's substantive due process claim.  STAT also alleges a procedural due process claim based on defendants not clearly communicating what plaintiff had to demonstrate in their application, and not providing plaintiff with a fair hearing.

STAT argues that it possesses a property or liberty interest in utilizing its license to practice its business.  However, "[a] party cannot possess a property interest in the receipt of a benefit when the state's decision to award or withhold the benefit is wholly discretionary." *EJS Properties, LLC v. City of Toledo*, 698 F.3d 845, 856 (6th Cir. 2012).  While in this case the court believes that defendants overstepped their statutory authority in adopting and applying the clinical needs protocol, the statute does give the

medical director some discretion in the licensure process.  This is evident from the fact that the department will not issue a life support agency license without a signature from the medical director on the Part I application.  An applicant for a life support agency license does not have a property or liberty interest in said license.  To survive a due process challenge in a case involving business matters, where there is not a property or liberty interest, or a fundamental right involved, SVMCA must demonstrate it had a rational basis for denying STAT's Part I application.

The weight of the evidence shows that SVMCA declined to sign the application because it wanted to protect MMR from competition by reducing the number of emergency medical services agencies operating in the area.  The result is the same even if the court credits SVMCA's stated reason that it wanted to reduce competition in order to maintain a high level of emergency services.  Medical control authorities must operate as authorized by statute, therefore they may not deny an application for a reason outside their authority.

Requiring STAT to show a "clinical need" before granting their approval for medical control oversight was outside SVMCA's statutory authority.  *Compare Gold Cross Ambulance and Transfer v. City of Kansas City*, 705 F.2d 1005, 1011-12 (8th Cir. 1983) (finding that Missouri state policy authorized a single-operator system where the statute permitted cities to "contract with one or more" operators to provide ambulance services).  The State of Michigan mandates by statute that where an ambulance operation meets the minimum requirements of the statute, the Department "shall" issue a license.  MCL 333.20920(2).  Michigan has not adopted a public utility model for ambulance operators like the State of Missouri.

-21-

Denying medical control oversight because adding another emergency services provider might have overloaded the system is not a rational basis when the medical control provider is not given statutory authority to deny oversight for that reason. Therefore, SVMCA has not demonstrated that it had a rational basis for declining to sign the Part I application.

C. Conclusion

In this case, STAT has demonstrated a strong likelihood of success on the merits.  The facts show that SVMCA exceeded its statutory authority in adopting and applying the clinical needs and mutual aid protocols.  In addition, the process by which the decision was made to decline medical control oversight to STAT reveals a multitude of conflicts of interest.  Furthermore, SVMCA did not respect the direction it received from the Michigan Department of Community Health. SVMCA appears to have been acting in a blatant effort to preclude competition in its geographic area for the benefit of a single emergency services provider owned by entities which control SVMCA's Board of Directors and provide the vast majority of its funding.

The court finds that STAT has also demonstrated a likelihood of success on the merits of its due process claim.

III.  Irreparable Harm

To obtain injunctive relief, the harm that would result in the absence of the injunction must be irreparable, not merely substantial.  *Sampson v. Murray*, 415 U.S. 61, 90 (1974).  When a constitutional right is being threatened, a finding of irreparable harm is mandated.  *Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001) (citation

omitted).  STAT has demonstrated that its constitutional right to due process has likely been violated due SVMCA's denial of its application.

Moreover, STAT's inability to operate its emergency medical services business in the SVMCA for an unknown period of time, despite having contracts with parties who wish to hire its services, also constitutes irreparable harm that cannot be fully compensated by monetary damages.  *See Performance Unlimited v. Questar Publishers*, 52 F.3d 1373, 1382 (6th Cir. 1995).

IV.  Balance of Harms

SVMCA argues that the quality of emergency services care will decline if too many agencies are approved to operate in the SVMCA.  The opposite conclusion - that the quality of care will increase due to more competition - is also possible, if not likely. In its application to operate, STAT stated that its entry into the market would "improve the response times in Birch Run from 12 minute 59 seconds 80% of the time to 8 minutes 59 seconds 90% of the time".  Given the finding that STAT has a likelihood of success on the merits and faces irreparable harm unless an injunction is granted, the balance of harms favors STAT.

V.  Injunctive Relief

To the extent STAT is asking the court to enforce the Department's DJR findings against SVMCA, that is the subject of a state-law mandamus claim, which STAT did not bring and for which exclusive jurisdiction exists in Michigan state court.  MCL 600.4401. Given the procedural posture of this case on plaintiff's motion for injunctive relief, the court is not in a position to order the ultimate relief sought by STAT and require SVMCA to sign the Part I application.  Rather, the court orders that the denial of the application

-23-

to operate be set aside, and that SVMCA reconsider STAT's application without consideration of the clinical need or mutual aid protocols.  The court instructs SVMCA and the medical director to follow the direction given to it by the Department.  This review shall occur forthwith.

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

I. Standard of Review

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *See Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir. 2001).  The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice.  The procedure is not a disfavored procedural shortcut.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *see also Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Amway Distributors Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Redding*, 241 F.3d at 532 (6th Cir. 2001).  "[T]he mere existence of

-24-

*some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original); *see also National Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 270 (1968); *see also McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson*, 477 U.S. at 248, 252. Rather, there must be evidence on which a jury could reasonably find for the non-movant. *McLean*, 224 F.3d at 800 (*citing Anderson*, 477 U.S. at 252).

## II. Ultra Vires Acts - Count I

Defendants' motion for summary judgment is denied for the reasons set forth in relation to plaintiff's motion for injunctive relief.

## III. Due Process - Count II

Defendants' motion for summary judgment is denied for the reasons set forth in relation to plaintiff's motion for injunctive relief.

IV. Equal Protection - Count III

STAT maintains that SVMCA treated it differently than other similarly situated emergency medical providers which did not have to meet the clinical needs protocol in order to be granted medical control oversight.  First, SVMCA argues that  STAT cannot establish the existence of any similarly situated persons who were treated differently by the SVMCA because STAT was the only applicant to have applied for medical control oversight under the clinical needs protocol.  It appears that at least three providers have been granted medical control oversight in SVMCA's geographic service area - MMR, Twin Township Ambulance, and Elsie Ambulance.  While none of these other providers had to meet the clinical need protocol, the court has already determined that the protocol is not authorized as adopted and applied by SVMCA.  Therefore, STAT is similarly situated to the other emergency medical providers that receive medical oversight from SVMCA.

Rational basis review applies to STAT's equal protection claim.  SVMCA's stated reason for treating STAT different than the other providers is that they wanted to keep the quality of services high by limiting the number of providers of emergency medical services in the area.  As the court found in discussing STAT's due process claim, SVMCA did not have the authority to deny an application for medical control oversight using the clinical needs protocol.  The court therefore denies defendants' motion for summary judgment on STAT's equal protection claim.

V.  Sherman Antitrust Act - Count VI

SVMCA first argues that it is immune from antitrust liability because it was acting pursuant to state policy when it limited competition for emergency medical services in its

geographic area.  *See Parker v. Brown*, 317 U.S. 341, 350-51 (1943).  The court disagrees, having already found that the State of Michigan has not adopted a public utility model for ambulance providers, and has in no way authorized SVMCA to suppress competition.  The fact that the Department approved SVMCA's protocols before they were applied to STAT is not authorization of a limitation on competition, particularly where the Department, upon denial justification review, instructed defendants to approve STAT's application.

Section 1 of the Sherman Antitrust Act addresses conspiracies between defendants to restrain trade.  A claim under section 1 requires the plaintiff to establish:

> the defendants contracted, combined or conspired among each other, that the combination or conspiracy produced adverse, anticompetitive effects within relevant product and geographic markets, that the objects of and conduct pursuant to that contract or conspiracy were illegal and that the plaintiff was injured as a proximate result of that conspiracy.

*Expert Masonry, Inc. v. Boone Cty., Ky.*, 440 F.3d 336, 342 (6th Cir. 2006) (citations omitted).  Defendants' only argument for summary judgment is that Saginaw County, not SVMCA, entered into an exclusive dispatch agreement with MMR.  Therefore, defendants claim they do not possess monopoly power and they are not liable for any effects on competition.  Contrary to defendants' argument, the evidence shows that they acted deliberately, and by agreement, to ensure that the SVMCA would only provide medical control oversight to one provider - that being MMR.  SVMCA's actions restrained STAT by ensuring that STAT would not be able to service its clients in the SVMCA and that none of the users of emergency services in Saginaw or Tuscola Counties would have any choice in who their ambulance provider could be for emergency calls.

Section 2 of the Sherman Antitrust Act prohibits monopolization of any part of trade or commerce.  An unlawful monopoly consists of:

> (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.

*Beard v. Parkview Hosp.*, 912 F.2d 138, 144 (6th Cir. 1990) (citation omitted). Defendants maintain that the SVMCA cannot be liable for a Section 2 claim because it does not possess any monopoly power in the emergency medical services market in Saginaw County.  None of the defendants compete with plaintiff or enjoy monopoly power in the relevant market.  Rather, it is MMR who enjoys a monopoly in the market. While MMR is not a named defendant in this action, there is sufficient evidence that SVMCA worked in concert with MMR to create, keep and maintain a monopoly.

Defendants' motion for summary judgment as to the Sherman Antitrust Act claims is denied.

## VI.  Fifth Amendment Taking - Count IV

In its complaint, STAT brought a claim titled "inverse condemnation", but which in fact alleges a takings claim in violation of the Fifth and Fourteenth Amendments. Defendants do not argue the merits of a takings claim in their motion for summary judgment, which is clearly what plaintiff has alleged in the text of Count IV.  The court therefore denies the motion for summary judgment without prejudice.

## VII.  Tortious Interference with Business Relationship

The elements of a claim for tortious interference with business relations are (1) the existence of a valid business relationship or expectancy; (2) knowledge of the

-28-

relationship or expectancy on the part of the defendant; (3) an intentional interference by the defendant inducing or causing breach or termination of the relationship or expectancy; and (4) resultant damage to the plaintiff.  *BPS Clinical Laboratories v. Blue Cross & Blue Shield of Michigan*, 217 Mich. App. 687, 699 (1996).  To establish the third element, a plaintiff must allege facts demonstrating the intentional doing of a per se wrongful act or the doing of a lawful act with malice for the purpose of invading the contractual rights or business relationship of another.  *See Michigan Podiatric Medical Ass'n v. National Foot Care Program, Inc.*, 175 Mich. App. 723, 736 (1989).  In this case there is sufficient evidence to support a claim for tortious interference where STAT attached its confidential contracts or expectancies to its Part I application, the Board charged with considering STAT's application was fraught with conflicts of interest, and the unauthorized protocols at issue were adopted at the insistence of MMR's CEO for the express purpose of protecting MMR's monopoly status in the SVMCA.

Defendants' motion for summary judgment as to plaintiff's tortious interference claim is denied.

<u>CONCLUSION</u>

For the reasons stated above, plaintiff's motion for injunctive relief is GRANTED IN PART.  SVMCA's denial of STAT's application to operate is set aside.  SVMCA is ordered to reconsider STAT's application without consideration of the clinical need protocol.  Nor shall a denial by SVMCA be based on the absence of a signed mutual aid agreement.  In conducting the review, which shall occur forthwith, SVMCA and its medical director shall follow the direction given by the Department, consistent with this opinion and order.  Defendants' motion for summary judgment is DENIED.

The court hereby sets a bench trial date of October 17, 2016 at 9:00 a.m.  The joint final pretrial order is due September 29, 2016.  The final pretrial conference will take place October 6, 2016 at 10:00 a.m.


Dated:  July 19, 2016

                                    s/George Caram Steeh
                                    GEORGE CARAM STEEH
                                    UNITED STATES DISTRICT JUDGE

---

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
July 19, 2016, by electronic and/or ordinary mail.

s/Marcia Beauchemin
Deputy Clerk

---